**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | * | **Case No: 26-1452** |
| Plaintiff, | * | **COMPLAINT** |
| v. | * | **DEMAND FOR JURY TRIAL** |
| **RICHARD MICHAEL DEWINE, in his official capacity as GOVERNOR OF THE STATE OF OHIO,** | * | |
| Defendant. | | |

## INTRODUCTION

1. This Complaint seeks to halt a misguided attempt to give Ohio colleges and universities an unfair, unprecedented, and unwarranted competitive advantage in stadiums and arenas throughout the country. College sports, like all sports, depend on participants following the rules. Defendant Richard Michael DeWine, the Governor of Ohio (named solely in his official capacity), is attempting to give Ohio institutions a hall pass to break the rules, in violation of multiple provisions of the United States Constitution as well as state law.

2. For decades, the National Collegiate Athletic Association ("NCAA") has attempted to preserve fair competition in college sports, host world-class championship events for student-athletes, and ensure that new generations of student-athletes get to experience the life-changing benefits of college sports each year.

3. The NCAA is a national membership organization of 1,092 colleges and universities, 361 of which compete in Division I ("DI"). DI schools recruit student-athletes nationwide, and DI student-athletes travel to compete against each other at sporting events held around the country.

4. Collectively, DI member schools adopt the rules governing all aspects of DI athletics, including recruiting, student-athlete eligibility, and fair competition. Those rules are not imposed from on high—they come from the members themselves. DI members—including member institutions in Ohio—debate, vote on, and ultimately enact the NCAA Bylaws ("Bylaws") by which they agree to be governed. The Bylaws are the product of a deliberative, representative legislative process in which all DI members have a voice and an opportunity to be heard.

5. Having rules means abiding by them. As children learn the first time they step on any field, there are rules to every sport that must be followed. College sports are no different. As a condition precedent to membership, each DI member institution agrees to abide by the DI Bylaws. That agreement ensures that the Bylaws will apply uniformly across the country, so that competition operates on a common footing rather than under a patchwork of different standards.

6. Among the most fundamental Bylaws are the ones governing student-athlete eligibility—how long a student-athlete may compete in college sports. The NCAA's core offering is college athletics, a distinct product from professional sports because the contest participants are college students pursuing college degrees. Eligibility rules create and maintain that distinction.

7. For decades, DI members generally limited participation in college sports to four seasons of competition within a five-year period, subject to specific waiver provisions allowing an extension of that eligibility period if certain circumstances were met. These rules roughly matched the period of college sports eligibility (five years) to the amount of time it takes the vast majority of student-athletes to obtain a college degree (four years).

8. Those rules enabled institutions to structure rosters and plan for recruiting. They ensured competitive balance. And they guaranteed that every year, new students would get opportunities to participate and share in the lifelong benefits of being a student-athlete.

9. For decades, those rules were well-accepted by all DI members; the few times they were challenged in court, they were upheld.

10. Over the last few years, however, those rules came under attack in federal and then state courts, with student-athletes filing lawsuits seeking additional seasons of competition. The lawsuits presented different theories over time, but had a single unifying theme: Get additional seasons of eligibility at all costs.

11. In June 2026, faced with this onslaught of litigation, the NCAA DI membership embraced a new eligibility paradigm called the Age-Based Eligibility Model, under which all student-athletes will receive five years of athletic eligibility starting upon the earlier of their 19th birthday or enrollment in college. The new rule largely eliminated waivers (an increasingly frequent source of litigation), containing only narrow exceptions for military service, religious missions, or pregnancy.

12. After considering all the equities, including by soliciting feedback from student-athletes, coaches, and university administrators, the NCAA's membership established a transition framework for implementation under which the new rule would apply prospectively. Prospective application ensured that student-athletes' eligibility status for upcoming seasons remained unchanged and avoided disrupting the settled expectations that eligible student-athletes had developed for their upcoming seasons. Under this transition framework, all student-athletes whose eligibility expired in the 2025–26 academic year would not receive additional seasons of competition.

13. The NCAA's governance bodies announced in April 2026 that the new rule would not grant additional eligibility to student-athletes whose eligibility expired in 2025-26, and the governing legislation that was ultimately adopted in June 2026 made this point crystal clear. The

NCAA's reasoning was simple: Student-athletes whose eligibility expired in the 2025–26 academic year already received the full measure of eligibility permitted by the rules in effect throughout their careers. Allowing them to return on the eve of competition in the 2026–27 academic year would upset the settled expectations and reliance interests of thousands of eligible student-athletes on campuses nationwide. Sports eligibility is zero-sum; as one example, there are 200 minutes of total playing time in a college basketball game, and every minute played by a returning fifth-year player would be a minute lost by an eligible student-athlete.

14. This set of reforms reflects the considered consensus of the nation's leading higher education institutions—including those in Ohio—about the proper eligibility rules for DI athletics, and the proper way to transition to a new regime. By definition, every eligibility rule will exclude some potential participants. And every rule change will do so too. The NCAA's membership considered these issues and its Cabinet unanimously voted on the plan in place today. Once the new rules were passed, they became binding on member institutions, including those in Ohio.

15. The response to that reform leads directly to this lawsuit. In *Borovicanin. v. NCAA*, No. A 2603352 (Hamilton Cnty. Ct. Common Pls., filed June 24, 2026), multiple DI basketball players who had already exhausted their eligibility under the pre-existing Bylaws filed suit seeking an additional season of competition.

16. The *Borovicanin* plaintiffs' initial contention was that the NCAA had breached contractual obligations to them by electing not to make the Age-Based Eligibility Model retroactive (in other words, by not giving student-athletes who completed four seasons of competition in 2025–26 an additional season of competition).

17. The *Borovicanin* plaintiffs obtained a preliminary injunction from the trial court. But the NCAA obtained a stay pending appeal, and on October 2, 2026, the Ohio First District

Court of Appeal reversed. In the meantime, numerous copycat lawsuits were filed, with the plaintiffs sometimes obtaining injunctions in the trial court only for those injunctions generally to be stayed pending appeal.

18. Despite the judicial process in the courts of his home state, Governor DeWine followed the *Borovicanin* appellate decision with the Executive Order that gives rise to this lawsuit. The Executive Order ("EO" or "Order") purports to direct in-state colleges and universities to flout the NCAA's eligibility rules:

> No State institution of higher education or private college or university in Ohio shall uphold any rule, requirement, standard, or other limitation that prevents a student-athlete of that institution or college in the Class of 2022 from fully participating in intercollegiate athletics in the 2026–27 academic year, regardless of whether the student-athlete completed four seasons of intercollegiate competition or exhausted eligibility under 2025–26 NCAA regulations or any prior regulations, and regardless of any athletic authority's interpretation or application of applicable NCAA eligibility bylaws[.]

Ex. A, Executive Order 2026-04D, ¶ 1.

19. In short, the EO purports to supersede the NCAA DI membership's decision to apply the Age-Based Eligibility Model prospectively, rather than retrospectively. The EO does so as to *all* "State institution[s] of higher education or private college[s] or universit[ies] in Ohio," meaning it extends even beyond DI. *Id.* But its effects will be felt primarily out of state, because Ohio institutions regularly compete against schools in other states. The EO thus purports to confer a competitive advantage on all Ohio institutions—they can roster experienced fifth-year seniors, in violation of the NCAA rules to which they agreed to be bound, and allow those individuals to compete against other schools who cannot roster such players under those same rules. That will harm both student-athletes within Ohio—who will lose roster slots to ineligible athletes—and student-athletes outside Ohio—who will face competitive disadvantages simply because they and their schools continue to follow the rules.

20. The Order cites no statute or other legal basis as justification for its purported authority. On the contrary, it purports to declare it "the public policy of this State" that in-state institutions should disregard NCAA eligibility rules and put on the field players who are clearly not eligible to compete. Ex. A, Executive Order 2026-04D, ¶ 2. But under Ohio law, the General Assembly is the "ultimate arbiter of public policy," *State ex rel. Jones v. Ohio State House of Reps.*, 200 N.E.3d 1071, 1074 (Ohio 2022) (citation omitted), and the "lawmaking prerogative cannot be delegated to or encroached upon by the other branches of government," *City of Toledo v. State*, 110 N.E.3d 1257, 1264 (Ohio 2018) (collecting cases).

21. It is also uncertain whether the Executive Order has any practical effect for the *Borovicanin* plaintiffs specifically (even though their attorneys have touted the Executive Order). The EO states that it is not intended "to require any institution to act contrary to an order of a court of competent jurisdiction," and the Ohio First District Court of Appeal has clearly stated that the *Borovicanin* plaintiffs are not eligible.

22. Nevertheless, it appears that the intent behind the Executive Order, if not its practical effect, is to provide a permission structure for schools in Ohio to disregard NCAA rules. That is unlawful for three independent reasons.

23. First, the Commerce Clause prohibits state action that burdens interstate commerce or regulates conduct beyond the state's borders. The dormant Commerce Clause rests on a straightforward "antidiscrimination principle." *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 369 (2023). A State may not enact laws that seek to reshape competition nationwide by conferring advantages on in-state institutions at the expense of out-of-state competitors. Courts have repeatedly struck down laws that purport to create these effects, including in cases involving the NCAA. *See NCAA v. Miller*, 10 F.3d 633, 638–39 (9th Cir. 1993). There can be no reasonable

debate that the Executive Order was intended to confer an advantage on in-state institutions, and in so doing, distort competition nationwide. The Executive Order also impermissibly burdens extraterritorial commerce because it purports to allow ineligible athletes to compete in competitions both inside and outside of Ohio. To the extent the Executive Order is a valid exercise of the Governor's authority and enforceable, it violates the dormant Commerce Clause.

24. Second, the Executive Order violates the First Amendment, to the extent it is valid and enforceable. The NCAA's authority to adopt and enforce its bylaws—as well as its specific decisions regarding what eligibility rules to adopt and when they should be effective—reflect the collective associational rights of its member institutions. Those member institutions have decided which student-athletes should be eligible for competition, and declared, through the NCAA Bylaws, that they want to associate with member institutions—and with student-athletes—who share those values so that college sports take place on a level playing field. The Executive Order undermines those values by purporting to provide Ohio institutions with legal cover to maintain their NCAA membership while simultaneously flouting the Association's rules. Specifically, the Executive Order purports to allow universities in Ohio to roster athletes that the NCAA's membership does not want to have on the field, infringing the NCAA membership's associational rights with no valid justification.

25. Finally, the Executive Order violates state law. Under Ohio law, a government official may not take actions that exceed his grant of authority. Such an improper attempt to exercise government power "is illegal and void" and ultra vires. *State ex rel. Clarke*, 134 N.E. 655, 656 (1921). Here, Governor DeWine lacks any authority to order Ohio colleges and universities to roster ineligible student-athletes. Indeed, the Executive Order itself cites no statutory or constitutional source of authority, beyond a general appeal to the "public interest." A general

appeal to public policy is no substitute for actual authority to take government action, which is held by the General Assembly—not the Governor. *Jones*, 200 N.E.3d at 1074. As a result, the Executive Order is null and void under Ohio law, and because the Governor's action is ultra vires, sovereign immunity is no bar to this Court's consideration of this claim.

26. To be clear, this lawsuit does not seek to target or harm student-athletes in any way. The NCAA respects and honors the accomplishments of athletes whose eligibility expired in the 2025–26 academic year and wishes them all the best in the future. But allowing them to return for an unexpected fifth season of competition would give them a benefit they never reasonably could have expected, to the detriment of thousands of eligible student-athletes who have been waiting for their opportunity to compete. Those student-athletes just as much deserve a voice and protection through the judicial process.

27. The NCAA thus respectfully requests that the Court issue a declaratory judgment under federal law that the Executive Order violates the U.S. Constitution to the extent it purports to provide a basis for schools to roster athletes in violation of NCAA rules; issue a declaratory judgment under state law that the Executive Order involves ultra vires governmental action and has no legal support or force of law; and enjoin Defendant under federal and state law from any efforts to enforce or implement the Executive Order. Using state law to undermine fair national competition threatens the viability of college sports and the basic lesson that all athletes learn early in their careers—to play by the rules.

## THE PARTIES

28. Plaintiff the NCAA is a non-profit, unincorporated association, composed of member institutions in all 50 states, headquartered in Indianapolis, Indiana.

29. Defendant Richard "Mike" DeWine is the Governor of Ohio. He resides in Columbus, Ohio and is sued in his official capacity. Governor DeWine issued and signed the Executive Order that gives rise to this lawsuit in Columbus, Ohio.

30. Defendant is sued solely in his official capacity for prospective declaratory and injunctive relief. The NCAA does not seek relief against Defendant in an individual capacity.

## JURISDICTION AND VENUE

31. The Court has subject matter jurisdiction over the NCAA's federal-law claims under 28 U.S.C. § 1331 because those claims arise under the Constitution of the United States, including the First Amendment, the Commerce Clause, and are enforceable against Defendant under 42 U.S.C. § 1983. The NCAA seeks prospective declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, against Defendant in his official capacity to prevent potential violations of federal law. *See also Ex parte Young*, 209 U.S. 123 (1908). This Court has supplemental jurisdiction over the NCAA's state-law claim under 28 U.S.C. § 1367(a) because that claim is so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

32. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District, including the signing of the Executive Order at issue.

## FACTUAL BACKGROUND

### A. The NCAA Is A Membership Organization That Governs Intercollegiate Athletics By Advancing Shared Values Of Its Membership.

33. The NCAA is a voluntary, self-governing membership organization composed of 1,092 four-year member colleges and universities across the United States that administers fair

and inclusive athletic competition for student-athletes. Approximately 500,000 student-athletes, hailing from all 50 states and countries throughout the world, compete in intercollegiate competition across the NCAA's three divisions. For each of these student-athletes, the NCAA is deeply committed to fostering an environment that promotes their well-being and development and creates opportunities for academic and athletic successes. *See* NCAA Constitution at 1, NCAA (Dec. 14, 2021), https://perma.cc/9PX3-27GV.

34. Since 1906, NCAA member institutions have promulgated and adopted rules that govern intercollegiate competition and establish eligibility standards for participation. While each of the NCAA's three divisions promulgates its own rules and operating guidelines, the NCAA and all of its members are required to abide by the NCAA's Constitution and Bylaws, which were originally created through an established legislative and governance process, including adoption pursuant to a vote by the entire NCAA membership, and are amended annually.

35. DI consists of 361 member schools that are grouped into 32 conferences. Athletic conferences are independent associations of member institutions that facilitate, coordinate, and govern athletic competition among their members.

36. While conferences may adopt their own rules, every DI member institution is required to follow the DI Manual, which contains the Bylaws governing DI athletic competition for more than 180,000 student-athletes. *See generally* NCAA Division I 2025–26 Manual ("DI Manual"), https://perma.cc/5BKM-MGH6. Since 1973, representatives of the educational institutions that compose DI have come together annually to review and revise the Bylaws contained in the DI Manual. The DI Manual, and its contained policies and rules, thus reflects the considered judgment of hundreds of educational institutions and a consensus of views that are as diverse as the NCAA's membership.

**B. The NCAA's Longstanding Eligibility Framework (The Five-Year Rule).**

37. For over a century, NCAA member schools have worked together to adopt rules to determine the eligibility of student-athletes to participate in intercollegiate athletics. Most fundamentally, DI eligibility rules determine who can compete, against whom they can compete, and for how long student-athletes may compete. The rules are grounded in the principle that athletics are an integral part of the educational experience. Accordingly, eligibility rules align the time permitted for intercollegiate athletics with the pursuit of an undergraduate education and degree progression. In so doing, the eligibility rules protect the NCAA's core commitment and core offering: facilitating opportunities for college students to participate in college athletics while also pursuing college degrees.

38. Collectively, the eligibility requirements promote collegiate athletics and advance the fundamental purpose of the schools that the student-athletes attend. They allow NCAA members to provide opportunities to hundreds of thousands of student-athletes that often change the trajectory of their adult lives. And by limiting eligibility to a finite window, the rules preserve opportunities for new student-athletes to share in these benefits.

39. For decades, student-athletes' participation had been limited to four seasons of intercollegiate competition, encompassing competition at either a two-year or four-year collegiate institution, within five calendar years. DI Manual (Bylaws 12.02.3, 12.6, 12.6.1), https://perma.cc/5BKM-MGH6. This limit was governed by the previous version of Bylaw 12.6, known as the "Five-Year Rule."

40. Under the Five-Year Rule and pursuant to former Bylaw 12.6, "[a] student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport," and must complete those four "seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time

program of studies in a collegiate institution," which was counted from "the student's first day of classes for that term." *Id.*, (Bylaws 12.6, 12.6.1, 12.6.1.1). Absent an applicable exception or waiver, the student-athlete's eligibility period, also known as the "eligibility clock," ended following the completion of four seasons of competition or five calendar years from the triggering date. *Id.*, (Bylaws 12.6, 12.6.1).

41. There were various exceptions to the Five-Year Rule's eligibility framework. One was a concept called "redshirting," where a student-athlete would utilize a year of eligibility but not a season of competition. *See id.* (Bylaw 12.6.3.1). Schools could also seek waivers of the five-year period of eligibility for their student-athletes, in certain defined scenarios, to provide them with "the opportunity to participate in four seasons of intercollegiate competition within a five-year period." *Id.* (Bylaws 12.6.1.7, 12.6.1.7.1).

### C. The Flood Of Federal And State Court Litigation By Ineligible Athletes Seeking To Sidestep The NCAA's Eligibility Rules And Extend Their Eligibility.

42. The DI eligibility framework under the Five-Year Rule served its intended purpose for many years and was well-understood and accepted as the cornerstone of college sports. That was until the last two years, when the NCAA's eligibility rules became the subject of persistent litigation.

43. In December 2024, Diego Pavia, the quarterback on Vanderbilt University's football team, filed a federal lawsuit arguing that the NCAA's eligibility rules counting junior college competition toward the four-season limit on DI participation were an unreasonable restraint on trade under the Sherman Act. *See Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025).

44. Before the *Pavia* lawsuit, every federal circuit to pass on the NCAA's eligibility rules under the antitrust laws had declined to disturb them. *See, e.g.*, *Bassett v. NCAA*, 528 F.3d

426, 433–34 (6th Cir. 2008); *Smith v. NCAA*, 139 F.3d 180, 185–86 (3d Cir. 1998), *vacated in part on other grounds*, 525 U.S. 459 (1999); *Agnew v. NCAA*, 683 F.3d 328, 343 (7th Cir. 2012). A district court, however, granted Pavia's "narrow" motion for preliminary injunctive relief "*as to Pavia*." *Pavia*, 760 F. Supp. 3d at 544 (emphasis in original).

45. Despite the stated limits to the district court's order, *Pavia* spawned a wave of copycat antitrust litigation. In most of these cases, the NCAA prevailed.[1] Even the judge who

[1] *Pavia*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025); *Wade v. NCAA*, No. 2:24-cv-196-TBM-RPM, 2024 WL 5212665 (S.D. Miss. Dec. 23, 2024) (denied); *Fourqurean v. NCAA*, No. 25-cv-68-wmc, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025) (granted), *rev'd*, 143 F.4th 859 (7th Cir. 2025); *Ciulla-Hall v. NCAA*, No. 25-cv-10271-DJC, 2025 WL 438707 (D. Mass. Feb. 7, 2025) (denied); *Arbolida v. NCAA*, No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025) (denied); *Goldstein v. NCAA*, No. 3:25-cv-27, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) (denied); *Osuna-Sanchez v. NCAA*, No. 3:25-cv-62-CEA-DCP, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025) (denied); *Smith v. NCAA*, No. 25CV003480-310, 2025 NCBC LEXIS 45 (N.C. Super. Ct. Apr. 24, 2025) (denied); *Jones v. NCAA*, No. 25CV003492-310, 2025 NCBC LEXIS 47 (N.C. Super. Ct. Apr. 25, 2025) (denied); *Elad v. NCAA*, No. CV 25-1981 (ZNQ) (JTQ), 2025 WL 1202014 (D.N.J. Apr. 25, 2025) (granted), *rev'd*, 160 F.4th 407 (3d Cir. 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885-DCN, 2025 WL 1370758 (D.S.C. May 11, 2025) (denied); *Coley v. NCAA*, 792 F. Supp. 3d 634 (E.D.N.C. 2025) (denied); *Hamilton v. NCAA*, No. 2:25-cv-924, 2025 WL 1615752 (E.D. La. June 6, 2025) (denied); *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025) (denied); *Johnson v. NCAA*, No. 9:25-cv-00060-KLD, 2025 WL 1790345 (D. Mont. June 26, 2025) (denied); *Walker v. NCAA*, No. 3:25-CV-00514-JWD-EWD, 2025 WL 1901907 (M.D. La. July 1, 2025) (denied); *Giles v. NCAA*, No. 8:25-cv-01488-JVS-KES, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025) (denied); *Hill v. NCAA*, No. 4:25-cv-00591-LPR, 2025 WL 3252322 (E.D. Ark. July 24, 2025) (denied); *Braham v. NCAA*, 794 F. Supp. 3d 824 (D. Nev. 2025), *opinion vacated, appeal dismissed*, 2026 WL 2653095 (9th Cir. Sept. 9, 2026); *Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025) (denied); *Bellamy v. NCAA*, No. 3:24-cv-00750, 2025 WL 2267761 (M.D. Tenn. Aug. 7, 2025) (denied); *Robinson v. NCAA*, No. 1:25-cv-00075-TSK, 2025 WL 2409203 (N.D.W.V. Aug. 20, 2025) (granted), *rev'd*, 172 F.4th 271 (4th Cir. 2026); *Boyd v. NCAA*, 3:25-cv-00729, 2025 WL 2432200 (M.D. Tenn. August 22, 2025) (denied); *Mayes v. NCAA*, No. 25CV045874-590, 2025 NCBC LEXIS 123 (N.C. Super. Ct. Sept. 11, 2025) (denied); *Martinson v. NCAA*, No. 2:25-CV-01376-RFB-DJA, 2025 WL 2678049 (D. Nev. Sept. 18, 2025) (appeal pending); *Moore v. NCAA*, No. DC-25-13153 (Tex. Dist. Ct., Dallas Cnty. Sept. 24, 2025) (granted), *appeal dismissed as moot*, 2026 WL 1739497 (Tex. Ct. App.—Dallas June 16, 2026); *Manu v. NCAA*, No. 3:25-cv-01311 (M.D. Tenn.) (filed Oct. 9, 2025) (denied); *Agee v. NCAA*, No. 25-002737-CV-472 (Tex. Dist. Ct., Brazos Cnty. Oct. 13, 2025) (granted), *appeal dismissed as moot*, 2026 WL 1831536 (Tex. Ct. App.—Waco June 25, 2026); *Johnson v. NCAA*, No. 2:25-cv-01288-JLG-KAJ, 2025 WL 3145866 (S.D. Ohio Nov. 11, 2025) (denied); *Hicks v. NCAA*, No. 25CVDC-00292, (Tex. D. Ct., Erath Cnty. Dec. 8, 2025) (granted), *rev'd*, 2026 Tex. App. LEXIS 8497 (Tex. Ct. App.—Eastland Aug. 31, 2026); *Bradley v. NCAA*, No. 2025-014323-CICI (Fla. Cir. Ct., Volusia Cnty. Jan. 9, 2026) (granted), *rev'd*, 429 So. 3d 1128 (Fla. Ct. App. 2026); *Patton v. NCAA*, No. 20521 (Tenn. Ch. Ct., Claiborne Cnty. Jan. 12, 2026) (denied); *Patterson v. NCAA*, 3:25-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026) (denied); *Humphreys v. NCAA,* No. 2:26-cv-00268-WLH-BFM, 2026 WL 129510 (C.D. Cal. Jan. 13, 2026) (denied); *Bediako v. NCAA*, 63-CV-2026-9000098.00 (Ala. Cir. Ct., Tuscaloosa Cnty. Feb. 9, 2026) (denied); *Hickman v. NCAA*, No. 2020-CP-10 (S.C. Ct. Common Pls. Feb. 11, 2026) (denied); *Blythe v. NCAA*, No. 3:26-cv-100-ART-CSD, 2026 WL 483345 (D. Nev. Feb. 20, 2026) (granted), *rev'd*, No. 26-1106, ---F.4th---, 2026 U.S. App. LEXIS 27680 (9th Cir. Sept. 9, 2026); *Aguilar v. NCAA*, No. 212611-3 (Tenn. Ch. Ct., Knox Cnty. Feb. 20, 2026) (denied); *Humphreys v. NCAA*, No. 26SMCV01157 (Cal. Super. Ct., Los Angeles Cnty. Mar. 10, 2026) (denied); *Coly v. NCAA*, No. 4:26-CV-8-PPS-APR, 2026 WL 799225 (N.D. Ind. Mar. 23, 2026) (denied); *Cruz v. NCAA*, No. 3:26-cv-00588-MMD-CLB, Doc. 30 (D. Nev. Aug. 28, 2026) (denied); *Trotter v. NCAA*, No. 3:26-0523, 2026 U.S. Dist.

granted the *Pavia* injunction subsequently denied three similar requests for preliminary injunctive relief, recognizing the need for a more developed record before entering an antitrust injunction. *See Bellamy v. NCAA*, No. 3:24-cv-00750, 2025 WL 2267761 (M.D. Tenn. Aug. 7, 2025); *Boyd v. NCAA*, 3:25-cv-00729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025); *Patterson v. NCAA*, No. 3:25-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026). In the few cases where an athlete prevailed in trial court on an antitrust claim, the NCAA appealed and won every case decided on the merits. *See Fourqurean v. NCAA*, 143 F.4th 859 (7th Cir. 2025); *Elad v. NCAA*, 160 F.4th 407 (3d Cir. 2025); *Robinson v. NCAA*, 172 F.4th 271, 292 (4th Cir. 2026); *Blythe v. NCAA*, No. 26-1106, 2026 WL 2653349, at *6 (9th Cir. Sep. 9, 2026); *Hicks v. NCAA*, No. 11-25-00382-CV, 2026 Tex. App. LEXIS 8497 (Tex. Ct. App.—Eastland Aug. 31, 2026); *Bradley v. NCAA*, 429 So. 3d 1128 (Fla. Ct. App. 2026).

46. The NCAA's success in federal courts led some ineligible athletes and their attorneys to turn to state court instead. And rather than challenge the rules wholesale under antitrust laws, ineligible athletes began to instead focus on waiver decisions, arguing that they received different treatment from other similarly situated athletes in violation of state contract law. The results of this second wave of lawsuits were mixed, with the NCAA winning some and losing others.[2] But the lawsuits unquestionably destabilized college sports, with ever-more disruptive lawsuits challenging foundational rules at the heart of organized sport.

47. As just one example, the NCAA faced a lawsuit from Texas Tech University (TTU) quarterback Brendan Sorsby, whom the NCAA declared permanently ineligible due to Sorsby

---

LEXIS 203604 (S.D.W.V. Sept. 9, 2026) (denied); *Lorient v. NCAA*, No. 1:26-cv-0094-JPB (N.D.W.V. Sept. 30, 2026) (appeal pending).

[2] Even when the NCAA has lost, it has been at a preliminary stage of the proceedings. None of these cases has proceeded to a final judgment.

having placed thousands of dollars of sports bets—some on his own team—while a student-athlete at three different universities between 2022 and 2026. This conduct violated the NCAA's Bylaws and would have been impermissible in every other American sports league. But Sorsby nevertheless obtained a court order allowing him to remain eligible to play for TTU for the 2026 football season during the pendency of the litigation. Temporary Injunction Order, *Sorsby v. NCAA*, No. DC-2026-CV-0791 (Tex. Dist. Ct., Lubbock Cnty. June 8, 2026).

48. Although Sorsby later voluntarily dismissed his lawsuit after deciding to pursue professional football with the NFL,[3] his win in state court underscored the growing instability created by the wave of litigation originating out of the Five-Year Rule. All told, roughly 100 student-athletes filed over 80 lawsuits challenging the Five-Year Rule. These lawsuits were brought by a small minority of student-athletes; there are hundreds of thousands of student-athletes who compete every year in DI sports, and the vast majority of athletes (and their schools) chose to abide by the Bylaws as drafted and never turned to the courts. But the cost and distraction of litigation—and the possibility of small but significant distortions to the competitive process—provided one reason for considering a potential change.

**D. The NCAA's Approval Of An Age-Based Eligibility Model.**

49. On June 23, 2026, the DI Cabinet, unanimously voted to approve a significant change to the NCAA's eligibility framework.[4] The DI Cabinet is a high-level governance group representative of diverse perspectives, including institutional leaders, faculty athletics representatives, conference officials, faculty members, and student-athlete representatives—

---

[3] *See Brendan Sorsby officially drops lawsuit against NCAA*, ESPN (June 18, 2026), https://www.espn.com/college-football/story/_/id/49109363/brendan-sorsby-officially-drops-lawsuit-ncaa.

[4] *Division I Adopts Age-Based Eligibility Model*, NCAA (June 23, 2026), https://www.ncaa.org/news/division-i-adopts-age-based-eligibility-model/.

including many from Ohio—and responsible for day-to-day decision-making for DI, with particular oversight of academic and athletics eligibility. Their vote proceeded after months of internal discussion and extensive conversations with member institutions, conference officials, and interested stakeholders from all aspects of the NCAA community, all of whom expressed significant support for the rule change.

50. The DI Cabinet voted to adopt the Age-Based Eligibility Model, under which student-athletes will now have a five-year period of collegiate eligibility to play college sports, beginning with the earlier of the following: (1) when the student-athlete initially enrolls full-time in any collegiate institution (e.g., international or domestic); or (2) the start of the regular academic year following the student-athlete's 19th birthday (with September 1 as the cutoff date for bumping the start of an individual's period of eligibility to start the next academic year).

51. Because the Age-Based Eligibility Model provides for five straight years of collegiate participation, it removes the distinction between a season of competition and a year of eligibility that existed under the Five-Year Rule. That removal results in a simpler, more predictable eligibility period that enables certainty for recruitment and roster planning and is more administrable for both school compliance officials and NCAA Eligibility Center staff.

52. In addition, the Age-Based Eligibility Model does not provide waivers to extend the five-year clock, containing only limited exceptions for pregnancy, religious missions, and active-duty military service. The complex waiver system gave way to a clear, bright-line rule.

53. The DI Cabinet's goal in adopting this rule change was to revise the NCAA's eligibility framework to create more concrete and predictable boundaries for eligibility that closely track the typical trajectory of college athletics participation in terms of attendance and degree progression. A rule change centered on initial collegiate enrollment or a student-athlete's 19th

birthday creates a predictable timetable for starting an eligibility clock and ensures that student-athletes across all sports will be closely aligned with each other in competing with and against peers of similar age and physical capability.

54. The Cabinet's unanimous June 23, 2026 vote became final on June 24, 2026. The Age-Based Eligibility Model became effective on August 1, 2026.

55. In promulgating, voting on, and approving the Age-Based Eligibility Model, the DI Cabinet considered the transition from one eligibility model to another. Eligibility rules by their very nature require setting outer bounds on who is eligible to play and for how long—as do decisions about when a new eligibility rule should take effect. The Cabinet carefully considered how to implement the Age-Based Eligibility Model. It ultimately decided on a straightforward approach that was clearly communicated. Starting in Fall 2027, the Age-Based Eligibility Model would apply to all student-athletes. Student-athletes enrolling for the first time in Fall 2026, and student-athletes with eligibility remaining after the 2025–26 academic year under the previous Five-Year Rule, would be able to choose between the pre-existing Five-Year Rule or the new Age-Based Eligibility Model. Student-athletes who exhausted their final season of competition during the 2025–2026 academic year would not be provided with additional eligibility.

56. In deciding not to make the Age-Based Eligibility Model retroactive to student-athletes whose eligibility was exhausted by spring of 2026, the DI Cabinet engaged in a reasoned, careful, and informed decision. Conference officials, among other stakeholders, had provided feedback that retroactivity would have the detrimental consequence of creating roster instability for member institutions and for student-athletes. If student-athletes who exhausted their eligibility during the 2025–26 academic year under the Five-Year Rule were allowed to stay and compete for an additional fifth year, they would potentially take roster spots and certainly take participation

opportunities from incoming student-athletes. Allowing this to happen would unfairly disrupt the expectations of incoming student-athletes and would have downstream negative effects for all of college sports.

57. In addition, the DI Cabinet, alongside these conference officials, reasoned that student-athletes who already exhausted their eligibility under the prior Five-Year Rule were not entitled to new benefits under the new Age-Based Eligibility Model. They had already received the expected benefit of the rules in effect throughout their college careers: four seasons of competition within a five-year period.

58. The various NCAA governance bodies involved in the transition to the Age-Based Eligibility Model made this rollout plan crystal clear. As early as April 2026, the NCAA released statements confirming that the "new rules are not expected to retroactively apply to student-athletes whose eligibility is or will be completed by the spring of 2026."[5] In June, after the Cabinet's vote, the NCAA confirmed that the eligibility model applied only to existing student-athletes "with eligibility remaining," even releasing an explanatory chart:[6]

| **Student-athletes** | **Which eligibility rules apply** |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |

The same guidance had been provided in explanatory charts released in reports of the DI Cabinet in May and early June.[7]

---

[5] *DI Board of Directors directs Cabinet to advance age-based eligibility rules*, NCAA (April 27, 2026), https://www.ncaa.org/news/media-center-di-board-of-directors-directs-cabinet-to-advance-age-based-eligibility-rules/.
[6] *Division I adopts age-based eligibility model*, NCAA (June 23, 2026), https://www.ncaa.org/division-i-adopts-age-based-eligibility-model.
[7] *Report of the NCAA Division I Cabinet May 22, 2026 Videoconference*, NCAA (May 22, 2026), https://perma.cc/WJH9-J8QD (explaining that for "[s]tudent-athletes who used final season of competition during 2025–26 but have time remaining in their period of eligibility," the "[c]urrent rules" would apply and they would be

59. Most critically, the NCAA legislation that was adopted said the same thing. It made clear that the new eligibility rules would take effect on August 1, 2026, and would apply only to student-athletes "with eligibility remaining" at that time:

> Effective Date: August 1, 2026; may be applied *to student-athletes with eligibility remaining (seasons and period of eligibility) who initially enrolled full time in any collegiate institution before August 1, 2026*. May be applied to student-athletes who initially enroll full time in any collegiate institution in the 2026-27 academic year. (Previous rules may be applied to student-athletes who enrolled before or enroll during the 2026-27 academic year; however, no waivers will be available. … Applicable to student-athletes who initially enroll full time in any collegiate institution in 2027-28 and thereafter.

Ex. B, Adopted Final Division I Prop. No. 2026-44 (emphasis added); *see also supra*, at n.4 (reflecting unanimous adoption of Prop. No. 2026-44). That legislation, including the description of how the new rules are to be applied, is the final adopted enactment passed unanimously by the NCAA membership. *See* Ex. B (describing legislative proposal as "Adopted Final").

**E. Yet Another Wave Of Litigation Follows The Adoption Of The Age-Based Eligibility Model.**

60. Within hours of the adoption of the Age-Based Eligibility Model —and before the two-day DI Cabinet meeting even reached its official close—yet another lawsuit was filed, this time challenging the transitional process.

61. On June 24, 2026, a group of fifteen plaintiffs brought suit against the NCAA in Ohio state court claiming that the NCAA's decision "to intentionally exclude all current college seniors who graduated high school in 2022 and have not redshirted" violates Ohio state law, among other claims. *Borovicanin, et al. v. NCAA*, No. A 2603352 (Hamilton Cnty. Ct. Common Pls., filed

---

"no longer eligible"); *Report of the NCAA Division I Cabinet June 5, 2026, Videoconference*, NCAA (June 5, 2026), https://perma.cc/8UNQ-VLW5.

June 24, 2026). Nine other plaintiffs joined the case after the initial complaint was filed, though two have since voluntarily dismissed.

62. The DI Cabinet, aware of the possibility of follow-on legal challenges, issued a public statement the same day the *Borovicanin* complaint was filed: "We do not intend to change course."[8] The Cabinet explained that "[s]tudent-athletes who will exhaust their eligibility this year have received the full period of eligibility permitted by NCAA Bylaws and the life-changing benefits college sports provides," and that "[g]iving those student-athletes another season would destabilize rosters just ahead of the coming season by disrupting settled expectations of countless student-athletes regarding their expected roster spots and playing time next year, including incoming freshmen who are eager to participate in the life-changing experience of college athletics." *Id.*

63. The trial court in *Borovicanin* issued a preliminary injunction. The NCAA promptly sought, and obtained, a stay pending appeal from the Ohio First District Court of Appeals. On October 2, 2026, the First District vacated the injunction, concluding that the district court's order lacked merit. Plaintiffs subsequently filed an appeal to the Ohio Supreme Court, requesting that the Court exercise its discretionary jurisdiction. That petition remains pending, but the Ohio Supreme Court has stayed the First District's mandate and requested additional briefing on the effect of the EO at issue in this case.

64. *Borovicanin* was not an isolated instance. Since the case was filed, other athletes have followed suit, often represented by attorneys operating under retention agreements that give them a share of any money the athletes receive if deemed eligible to compete. In some instances—including in Colorado, Illinois, Nevada, South Carolina, New Jersey, Florida, Missouri, Texas,

---

[8] NCAA DI Cabinet (@NCAA_PR), X (June 24, 2026), https://x.com/NCAA_PR/status/2069909731364249863.

and Arizona—the NCAA has prevailed (though in some of those states results have been mixed). In other instances, trial courts have granted preliminary injunctions, only for those injunctions to be stayed pending appeal. Currently, state appellate courts in Tennessee and Georgia have granted stays; the NCAA is pursuing stays in Oklahoma, Indiana, and Louisiana; and the NCAA has appealed and will continue to appeal any and all unfavorable decisions.

**F. Executive Order 2026-04D**

65. On October 14, less than two weeks after the *Borovicanin* decision from the First District, Defendant DeWine issued an Executive Order that, in practical effect, sought to nullify the decision while it was still on appeal.

66. The text of the order is attached as Exhibit A. It begins by specifically targeting the issue of retroactivity: "WHEREAS, recent changes have been made to eligibility requirements for collegiate sports by the NCAA that uniquely and unfairly impact student-athletes who started college in 2022." Ex. A at 1. It then specifically adverts to litigation by athletes in that cohort, noting that such some athletes have obtained court orders allowing them to compete, and that "Ohio's colleges and universities will compete in the 2026–27 season against institutions whose student-athletes have been permitted to play a fifth year by those orders, while similarly situated student-athletes in Ohio remain unable to compete." *Id.* The EO does not provide any sense of proportion, but the facts are clear: The athletes currently allowed to compete under court orders are a small minority, numbering around 340 throughout the country. By contrast, thousands (if not tens of thousands) of athletes throughout Ohio could fall within the class of 2022 group mentioned in the EO's preamble.

67. Citing "principles of fairness," the Executive Order purports to direct Ohio institutions—public and private—to disregard NCAA eligibility rules. The order declares that institutions "shall [not] uphold" any rule that would preclude an additional season of competition

by individuals who enrolled in the 2022 Academic Year and exhausted their eligibility in 2025–26, so long as they qualify under the terms of the Age-Based Eligibility Model, are academically eligible, and did not participate in a professional sports league. *Id.* ¶ 1. The EO adds that an Ohio institution that permits athletes to "practice or compete in accordance with this order does so at the direction of the State of Ohio and in compliance with the public policy of this State." *Id.* ¶ 2.

68. Notwithstanding its use of the term "shall" in the provision directing institutions to disregard NCAA rules, the EO preserves the rights of institutions to enforce their own rules, *id.* ¶ 3, and does not "require[] a State institution of higher education or private college or university in Ohio to offer a roster position or athletic aid to any particular student-athlete," *id.* ¶ 4. The Order concludes with a series of reservations, including that "Nothing in this Order is intended to decide, or direct any court concerning any matter pending before any court, or to require any institution to act contrary to an order of a court of competent jurisdiction," *id.* ¶ 5.

69. The press release accompanying the order makes clear that it was intended to provide Ohio institutions with the ability to disregard NCAA rules: "Today's executive order gives Ohio institutions of higher education the authority to decline to uphold the NCAA's restriction against all otherwise eligible student-athletes who graduated high school in 2022 while legal challenges proceed."[9] The press release pitches the Executive Order as an effort to level the playing field so that Ohio athletes are not disadvantaged relative to athletes in other states who have obtained injunctions allowing them to compete. But that is disingenuous; those injunction orders cover a tiny fraction of athletes, and all are on appeal if not already stayed. The Executive Order, by contrast, purports to extend the same relief to all athletes at all Ohio institutions, with far more

---

[9] *Governor DeWine Signs Executive Order Addressing College Athlete Eligibility*, Governor of Ohio (Oct. 13, 2026), https://governor.ohio.gov/media/news-and-media/governor-dewine-signs-executive-order-addressing-college-athlete-eligibility.

sweeping and significant effects. Indeed, the EO is not even limited to DI, but appears to apply to *any* athlete seeking to compete in NCAA athletics, including in Divisions II and III, even though no athletes have obtained injunctions in those Divisions.

70. Despite invoking "public policy" (the purview of the Ohio General Assembly), the Executive Order does not cite any source of law whatsoever—no statute, regulation, or Ohio Constitutional provision. Nor did the Governor cite any in the press materials surrounding the Order. That is because no such authorization exists.

**G. The Executive Order's Impact On Fair Competition.**

71. Intercollegiate athletics are an "important American tradition." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984). They provide inspiration for young men and women across the country and present a unique opportunity for young adults to develop leadership skills, balance academic and extracurricular responsibilities, and work together with lifelong friends in a high-stakes setting. Maintaining this experience means that the NCAA—just like other national athletic organizations—creates "agreement[s] among competitors on the way in which they will compete with one another." *Id.* at 99. The agreements "allow the NCAA to promote uniform and fair gameplay—cooperation without which college sports would not exist in its current form." *Pavia*, 154 F.4th at 415 (6th Cir. 2025) (Thapar, J., concurring).

72. The integrity of the NCAA's eligibility rules "cannot be preserved except by mutual agreement" between every NCAA member institution in the country. *Bd. of Regents*, 468 U.S. at 102. Unilateral actions by even a single member institution destroy that mutual agreement. *See Miller*, 10 F.3d at 639 (quoting *Bd. of Regents*, 468 U.S. at 102). Schools that cast aside those restrictions unilaterally may gain short-term benefits by recruiting experienced college athletes, or even former professional athletes, to their teams. The schools that choose to maintain the integrity of their eligibility restrictions are then put to a choice—play by the rules at a competitive

disadvantage or break the rules themselves. This invites a race to the bottom. Enforcing the uniformity of the NCAA's eligibility rules among all NCAA members is critical for the organization's vitality, for the very idea of fair competition in college sports, and for the concept of college sports as a distinct offering from professional sports.

73. Adopting a common set of rules for the NCAA's members, and enforcing them where appropriate, occurs through the channels of interstate commerce. *See Miller*, 10 F.3d at 638. NCAA members attend NCAA-organized events across the country and agree to follow the NCAA's rules before, during, and after those events.

74. The Executive Order cuts at the heart of fair competition. It purports to give all athletes in Ohio the benefit of the Age-Based Eligibility Model, even those who do not qualify under the plain terms of the legislation the NCAA enacted. If the order were valid, it would give those schools a decided competitive advantage—they could disregard NCAA rules and roster experienced veteran players in competition against other schools, throughout the country, that are bound to continue to follow NCAA rules.

75. The competitive advantage could also impact financial distributions, which would further harm student-athletes and schools outside Ohio. As just one example, the NCAA's membership has voted to distribute some NCAA revenues to DI schools based on their success in the NCAA DI men's and women's basketball tournaments. If an Ohio university is able to advance further in the tournament after rostering ineligible athletes, that institution will be entitled to a larger payout than schools in other states that are playing by the rules. Those extra funds—which are often used to support student-athletes who play sports other than basketball—will only further increase the competitive advantage to Ohio schools.

76. It is no answer to claim that the Executive Order is necessitated by court orders allowing certain other ineligible athletes to compete. That is like saying the presence of a few cars speeding on the highway justifies eliminating the speed limit entirely. Moreover, all of those court orders are on appeal, and many have been stayed pending appeal. There can be no dispute as to which is the greater distortion to the competitive process—a handful of court orders that are still working their way through the system, or an Executive Order that purports to apply state-wide, with effects that will be felt throughout the country.

77. And the concerns about the race to the bottom are very real. While some officials in other states have rightly questioned the validity of the EO, it is possible that others will elect to follow Governor DeWine's course,[10] further undermining fair competition. In fact, recent reporting suggests that "other governors could 'follow suit' with similar orders as soon as next week."[11]

78. In college sports, as in a court of law, the solution to rule-breaking is not more rule-breaking. This Court's intervention is thus necessary.

## FIRST CLAIM FOR RELIEF

### (Injunctive Relief Against Defendant Under 28 U.S.C. § 1983 for Violations of the Commerce Clause of the U.S. Constitution)

79. The NCAA realleges and incorporates herein by reference the allegations of all the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

---

[10] Mike Hilgers (@mikehilgers), X (Oct. 13, 2026), https://x.com/mikehilgers/status/2110149341377638419 (statement from Nebraska Attorney General Mike Hilgers describing the EO as "unprecedented," stating that he cannot "imagine such an order being enforceable against the league, let alone in Nebraska," and promising to "take all necessary and appropriate measures to protect the competitive integrity of the season").

[11] Chantz Martin, *Ohio Gov Mike DeWine defies NCAA eligibility rule with executive order for student-athletes*, Fox News (Oct. 14, 2026), https://www.foxnews.com/outkick-sports/ohio-gov-mike-dewine-defies-ncaa-eligibility-rule-executive-order-student-athletes.

80. The Commerce Clause of the U.S. Constitution "not only vests Congress with the power to regulate interstate trade" but also "forbid[s] the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).

81. An "antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." *Nat'l Pork*, 598 U.S. at 369 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)).

82. Based on this fundamental principle, courts have consistently held that the dormant Commerce Clause prohibits states from frustrating the uniform operation of associations and entities that govern interstate sports competition—including the NCAA. Indeed, one of the key cases on point involved a similar effort by the State of Nevada to attempt to override the NCAA's Bylaws. *See Miller*, 10 F.3d 633. In *Miller*, the Ninth Circuit invalidated a Nevada statute that required the NCAA to provide Nevada institutions, employees, student-athletes, or boosters with "certain procedural due process protections during [] enforcement proceeding[s]" that conflicted with the NCAA's adopted procedures. *Id.* at 637. The court reasoned that the NCAA "engage[s] in interstate commerce in numerous ways" including by "schedul[ing] events that call for transportation of teams across state lines" and governing "nationwide amateur athlete recruiting." *Id.* at 638. Thus, the court held that the Nevada statute was "directed at interstate commerce and only interstate commerce" and had an impermissibly "profound effect on the way the NCAA enforces its rules and regulates the integrity of its product." *Id.*

83. Other courts have made similar rulings under the Commerce Clause as to other interstate sports associations. *See City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d

686, 691 (9th Cir. 2015) (dismissing state antitrust and unfair competition claims against MLB); *MLB v. Butterworth*, 181 F. Supp. 2d 1316, 1334 (N.D. Fla. 2001) (state antitrust laws cannot be applied to MLB rules under the dormant Commerce Clause); *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 380 (1983) (rejecting Cartwright Act challenge to NFL rules); *Robertson v. NBA*, 389 F. Supp. 867, 881 (S.D.N.Y. 1975) (same for application of state antitrust laws to NBA rules); *HMC Mgmt. v. New Orleans Basketball Club*, 375 So. 2d 700, 706-07 (La. App. 1979) (same); *Matuszak v. Houston Oilers, Inc.*, 515 S.W.2d 725, 728–29 (Tex. Civ. App. 1974) (same, for NFL rules).

84. Each of these decisions recognizes that the "necessity of a nationwide league structure for the benefit of both teams and players for effective competition is evident as is the need for a nationally uniform set of rules governing the league structure." *Partee*, 34 Cal.3d at 384.

85. Courts have thus precluded the application of state law to the NCAA when doing so would "subject the NCAA to conflicting [state] requirements" or "force the NCAA to regulate the integrity of its product in every state" according to one state's rules. *Miller*, 10 F.3d at 639; *see also Flood v. Kuhn*, 443 F.2d 264, 268 (2d Cir.1971), *aff'd*, 407 U.S. 258 (1972) ("[I]t is apparent that each league extends over many states, and that, if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard.").

86. More broadly, courts have recognized that protectionist state laws are invalid under the dormant Commerce Clause in three independent scenarios:

87. First, "the Commerce Clause prohibits the enforcement of state laws 'driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic

interests by burdening out-of-state competitors.'" *Nat'l Pork*, 598 U.S. at 369 (ellipsis adopted) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)). "State laws that discriminate against interstate commerce face a virtually per se rule of invalidity." *S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018) (internal quotations and citation omitted); *see also Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023) ("[I]f a law discriminates, the courts will 'almost always' find it invalid[.]" (quoting *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018))).

88. Second, "the Supreme Court recognizes a second category of regulation that is also virtually *per se* invalid under the dormant Commerce Clause—whether the law regulates extraterritorial commerce" impermissibly. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (quotation marks omitted); *see Miller*, 10 F.3d at 639 (holding that Nevada statute regulating the NCAA violated the Commerce Clause because it "directly control[led] commerce occurring wholly outside the boundaries of a State" (quoting *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 336 (2013))). "The relevant inquiry is whether the 'practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Am. Beverage Ass'n*, 735 F.3d at 373 (quoting *Healy*, 491 U.S. at 336). Statutes with such an effect constitute an "impermissible burden on interstate commerce." *Granholm v. Heald*, 544 U.S. 460, 477 (2005)

89. Third, a state and its agents cannot enforce a law that imposes burdens on other states that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Partee*, 34 Cal. 3d at 384–85 (holding that statute was unconstitutional because "[f]ragmentation of the league structure on the basis of state lines would adversely affect the success of the competitive business enterprise"). Both the "consequences of the statute itself" and "how the challenged statute may interact with the legitimate regulatory regimes of the other States and what effect would arise if not one, but many or every, [jurisdiction]

adopted similar legislation" are useful in assessing benefits and burdens. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment) (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 453–54 (1992)). The extent of the burden imposed on a state "will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

90. The Executive Order is invalid on each of these grounds. To start, the Order has a clear discriminatory purpose because it will give a competitive advantage to Ohio institutions and athletes relative to institutions and student-athletes in other states. While now-ineligible members of the Class of 2022 can continue competing for "college and universities within the State of Ohio," Ex. A, Executive Order 2026-04D, at 1, athletes in the other 49 states will not have that option. This imbalance will give Ohio schools a clear competitive advantage because they will have access to experienced and older student-athletes who are no longer eligible to compete in the rest of the country. Schools and ineligible athletes in Ohio will get a benefit (the ability to roster ineligible players)—and schools outside Ohio, and their less experienced student-athletes, will face a burden (the distortion of the competitive process). This competitive advantage could also have a financial component if Ohio schools rostering ineligible players are able to earn more NCAA revenues by, for example, advancing further in the NCAA tournament.

91. The Executive Order also impermissibly regulates extraterritorial commerce. The Order purports to allow members of the Class of 2022 to "fully participat[e] in intercollegiate athletics," Ex. A, Executive Order 2026-04D, including in competitions outside Ohio. The order will thus force member institutions outside Ohio, playing previously scheduled games against Ohio universities and colleges, to host and compete against ineligible athletes. Moreover, now that the Order purports to bestow an advantage to Ohio member institutions, the NCAA is faced with the

choice of either leaving untouched Ohio's advantage, or evening the playing field by acceding to the Order in every state such that "[Order] could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside [Ohio]'s borders." *Miller*, 10 F.3d at 639. This sort of extraterritorial pressure (to which the NCAA does not intend to accede) is exactly the kind the dormant Commerce Clause forbids.

92. Similarly, the Executive Order places an excessive burden on other states. National sports leagues could not function if subjected to varying requirements under state law because the "nationwide league structure of professional football requires nationally uniform regulation." *Kelsey K. v. NFL Enter., LLC*, 254 F.Supp.3d 1140, 1149 (N.D. Cal. 2017). Where there is "a nationwide league structure for the benefit of both teams and players for effective competition," then "the burden on interstate commerce outweighs the state interests in applying state antitrust laws to those relationships." *Partee*, 34 Cal. 3d at 384–85.

93. Ultimately, "when a state law directly regulates interstate commerce, it can generally be struck down without further inquiry." *Miller*, 10 F.3d at 640 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). That is the case here.

94. Defendant, acting in his official capacity, has subjected the NCAA to the deprivation of its rights under the Commerce Clause by issuing, and presumably planning to enforce, an Executive Order that, if valid, poses significant burdens on interstate commerce that are clearly excessive in relation to any putative local benefits in Ohio. *See Dennis v. Higgins*, 498 U.S. 439, 440 (1991) (holding that suits for violations of the Commerce Clause may be brought under 42 U.S.C. § 1983). Defendant is likewise liable under *Ex parte Young*, 209 U.S. 123 (1908).

95. Injunctive relief pursuant to 28 U.S.C. § 1983 and *Ex parte Young* that bars Defendant from taking any action to effectuate the EO is appropriate and necessary to vindicate the NCAA's constitutional rights.

**SECOND CLAIM FOR RELIEF**

**(Declaratory Relief – Defendant's Unconstitutional Application of Ohio State Law Extraterritorially in Violation of Horizontal Separation of Powers)**

96. The NCAA realleges and incorporates herein by reference the allegations of all the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

97. "[T]he States in the Union are coequal sovereigns under the Constitution." *PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012). The constitutional scheme would be wholly frustrated if states could use their sovereign power to regulate actions outside their jurisdiction.

98. To ensure that each state maintains its individual "integrity, dignity, and residual sovereignty," *Bond v. United States*, 564 U.S. 211, 221 (2011), the Supreme Court has confirmed that the "territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded in the "original and historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces." *Nat'l Pork*, 598 U.S. at 376 & n.1 (quoting *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996)); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment).

99. "[O]riginal and historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces" confirm that States cannot enforce laws that directly regulate transactions outside that state. *Nat'l Pork*, 598 U.S. at 376 & n.1.

100. The Executive Order purports to regulate the terms of collegiate competition wholly outside Ohio by allowing Ohio schools to flout nationwide rules even while playing outside the state. The Executive Order thus violates the Constitution's "horizontal separation of powers." *Id.*

## THIRD CLAIM FOR RELIEF

**(Declaratory and Injunctive Relief Under 42 U.S.C. § 1983 and 28 U.S.C. § 1331 Against Defendant for Violations of the First and Fourteenth Amendments of the U.S. Constitution)**

101. The NCAA realleges and incorporates herein by reference the allegations of all the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

102. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "The First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976).

103. The First Amendment protects a "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). "Freedom of association therefore plainly presupposes a freedom not to associate." *Roberts*, 468 U.S. at 623.

104. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Boy Scouts*, 530 U.S. at 648.

105. The NCAA, as a sports organization, is engaged in expressive association and is therefore subject to First Amendment protection. *See, e.g.*, *NCAA v. Associated Press*, 18 So. 3d 1201, 1214 (Fla. Dist. Ct. App. 2009) (assuming that the NCAA "enjoys the freedom of association"); *Hill v. NCAA*, 865 P.2d 633, 659 (Cal. 1994) (holding that student-athletes have "no legal right to participate in intercollegiate athletic competition" because they have "fully and

voluntarily acquiesced in the application of [NCAA] rules" and "[t]o view the matter otherwise would impair the privacy and associational rights of *all* NCAA institutions and athletes"); *cf. Green v. Miss U.S. of Am.. LLC*, 52 F.4th 773, 780 (9th Cir. 2022) (noting that a sports event like the Super Bowl halftime show that combines speech with a live performance may still qualify as expressive speech). The NCAA's expressive and associational interests arise from its members' collective adoption and enforcement of rules defining intercollegiate athletics, including eligibility standards that preserve fair competition, roster opportunities, academic alignment, and the distinct character of college sports.

106. The NCAA engages in expressive activity, including as enumerated in the "Principles" Section of its Constitution, Article 1. "It seems indisputable that an association that seeks to transmit . . . a system of values engages in expressive activity." *Boy Scouts of America*, 530 U.S. at 650. The NCAA does just that. It aims to "establish and maintain an environment in which a student-athlete's activities are conducted with the appropriate primary emphasis on the student-athlete's academic experience." *Id*. (A). Further, the NCAA seeks to transmit values such as "integrity and sportsmanship" and to "promote[] the ideals of higher education, human development and the integrity of intercollegiate athletics," providing that "[a]ll individuals associated with intercollegiate athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty, responsibility, academic integrity, ethical conduct, and the rules of their conferences." *Id*. (C). The NCAA is also committed to conducting intercollegiate athletics programs "in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes," *id*. (D), and to creating "diverse and inclusive environments" that with "an atmosphere of respect for and sensitivity to the dignity of every person," *id*. (F), and "in a manner free of gender bias, *id*. (G). It is the responsibility of each

member institution "to monitor and control its athletics program" and "to ensure compliance with the rules established by the Association." *Id*. (E).

107. The Order deprives the NCAA of its right of expressive association by requiring it to disregard these sincerely held beliefs. After careful deliberation, the NCAA's member institutions made a collective decision that athletes from the Class of 2022 who exhausted their eligibility under the rules in force during their collegiate careers should not be granted an extra year of eligibility in connection with the shift to the Age-Based Eligibility Model. This decision flows from the NCAA's core values of supporting the student-athlete's academic experience. It promotes values of fairness, ethical conduct, and sportsmanship, as it enables new student-athletes to compete at the universities they chose based on the expectation that Class of 2022 athletes who had exhausted their eligibility were no longer eligible. And it ensures fairness across collegiate sports, as all member institutions agree to be bound by this rule such that none has an unfair advantage.

108. Compelling, or at least permitting, Ohio colleges and universities to roster ineligible athletes undermines both the NCAA's regulatory scheme and these shared values of the NCAA's membership. Every time an ineligible athlete takes the floor, it communicates to the public that the NCAA is either agreeing to or unwilling to take action against violations of its rules and expressive commitments, even though that is plainly not the case.

109. The Order also undermines the NCAA's values of fairness, integrity, and sportsmanship because it effectively grants Ohio schools an exemption that is unavailable to the many institutions in the other forty-nine states. Institutions in other states that comply with the NCAA eligibility rules are placed at an unfair disadvantage because they will be forced to compete against Ohio institutions that play athletes who have already competed for four seasons.

110. The impact of the Order will further undermine confidence in intercollegiate sports and impose severe burdens on the NCAA's associational rights. Other states may observe that the NCAA's enforcement can be overridden by stratagems like the Order. If Ohio colleges and universities flout the rules in reliance on the EO, more states may choose to adopt Defendant's adversarial position to maintain their competitive advantage, further eroding the NCAA membership's clear contrary viewpoint.

111. Defendant bears no compelling state interest to justify the burden that the Executive Order orders places on the NCAA.

112. Prospective injunctive relief pursuant to 28 U.S.C. § 1983 and *Ex parte Young* is thus appropriate and necessary to vindicate the NCAA's First Amendment rights.

## FOURTH CLAIM FOR RELIEF

**(Declaratory and Injunctive Relief Under Ohio State Law Against Defendant for Ultra Vires Attempted Exercise of Power and Violation of State Law)**

113. The NCAA realleges and incorporates herein by reference the allegations of all the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

114. Under Ohio law, an action taken by a government official "is illegal and void" if that official "has exceeded its statutory grant of power." *Clarke*, 134 N.E. at 656. Aggrieved parties have a cause of action to seek declaratory and injunctive relief against state officials, including the Governor, for violations of state law. *See State ex rel. Ohio Stands Up!, Inc. v. DeWine*, 192 N.E.3d 371, 378 (Ohio 2021) (Kennedy, J., concurring in judgment) (citing Ohio Rev. Code §§ 2721.02(A), 2721.03, 2727.02, 2727.03); *see also Moore v. City of Middletown*, 975 N.E.2d 977, 988 (Ohio 2012) (observing that "R.C. Chapter 2721 is the legislative source of a cause of action for declaratory relief").

115. Article II, Section 1 of the Ohio Constitution vests legislative power in the General Assembly, while Article III, Section 5 vests executive power in the Governor. *State v. Daniel*, 229 N.E.3d 81, 87 (Ohio 2023). The General Assembly is the "ultimate arbiter of public policy," *Jones*, 200 N.E.3d at 1074, and the "lawmaking prerogative cannot be delegated to or encroached upon by the other branches of government," *City of Toledo v. State*, 110 N.E.3d 1257, 1264 (Ohio 2018). Accordingly, the Governor must identify constitutional or statutory authority for his actions. A claimed desirable public-policy objective alone is insufficient.

116. The Governor lacks general authority to issue orders to universities and colleges in Ohio. Under Ohio law, the "full power and authority on all matters" related to the "administration" of public institutions resides with the relevant board of trustees, not the Governor. Ohio Rev. Code § 3345.021. And the Governor, of course, has no authority to direct private institutions, which are also purportedly subject to the Order.

117. Here, the Order identifies *no* statutory or constitutional source of authority for the EO. Instead, the EO simply declares that rostering ineligible athletes is "in compliance with the public policy of this State." Ex. A, Executive Order 2026-04D, at ¶ 2. But the General Assembly—not the Governor—decides public policy, and no Ohio law gives Defendant the power to dictate who can compete in NCAA competitions. To the extent the General Assembly has spoken on this issue, it has given power to public institutions, *not* the Governor. "The power, not being so granted to the [Governor], cannot be exercised by the [Governor], and its attempted exercise thereof is ultra vires." *See Clarke*, 134 N.E. at 656.

118. Sovereign immunity is no bar to this claim. The Supreme Court has long held that when an "officer is not doing the business which the sovereign has empowered him to do," "[h]is actions are ultra vires his authority and therefore may be made the object of specific relief." *Larson*

*v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Miami Univ. Associated Student Gov't v. Shriver*, 735 F.2d 201, 204 (6th Cir. 1984) ("State officials are not entitled to [E]leventh [A]mendment immunity if they are acting ultra vires."); *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 966 n.5 (5th Cir. 1993) (stating the same).

119. "[A] state officer may be said to act ultra vires only when he acts 'without any authority whatever.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). That is the case here because Defendant has no basis for issuing the Order. Again, the EO cites no ground for forcing Ohio colleges and universities to roster ineligible athletes.

120. Injunctive and declaratory relief are necessary and appropriate under Ohio law to halt Defendant's ultra vires invocation of state authority.

## PRAYER FOR RELIEF

WHEREFORE, the NCAA respectfully requests that this Court provide the following relief:

A. Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Ohio law, that the Order is ultra vires, unlawful under the First Amendment, and unlawful under the Commerce Clause because it undermines the NCAA's authority under its Bylaws to set eligibility standards for student-athletes;

B. Enjoin, pursuant to 42 U.S.C. § 1983, *Ex parte Young*, the Commerce Clause, the First Amendment, and Ohio law, the Order and preclude Defendant from directing Ohio colleges and universities to disregard NCAA eligibility rules;

C. Award such costs and reasonable attorneys' fees to which it might be entitled by law; and

D. Grant any other and further relief that the Court deems just and proper.

Dated: October 16, 2026

Respectfully submitted,

By: /s/ *Keith Shumate*
**SQUIRE PATTON BOGGS**
Keith Shumate (0056190)
Erin K. Hassett (0099970)
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Telephone: (614) 365-2834
keith.shumate@squirepb.com
erin.hassett@squirepb.com

Lauren S. Kuley (0089764)
201 E. Fourth St., Ste 1900
Cincinnati, OH 45202
Telephone: (513) 361-1200
lauren.kuley@squirepb.com

By: /s/ *Rakesh N. Kilaru*
**WILKINSON STEKLOFF LLP**
Rakesh N. Kilaru (*pro hac vice* forthcoming)
David Friedman (*pro hac vice* forthcoming)
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
dfriedman@wilkinsonstekloff.com

Caroline Li (*pro hac vice* forthcoming)
130 West 42nd St, 24th Floor
New York, NY 10036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
cli@wilkinsonstekloff.com

**HOLLAND & KNIGHT LLP**
Taylor J. Askew (*pro hac vice* forthcoming)
David J. Zeitlin (*pro hac vice* forthcoming)
Symphony Place
150 Third Avenue South

Nashville, Tennessee 37201
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

*Attorneys for Plaintiff National Collegiate Athletic Association*